No. 23,071.

MISSOURI FINANCE CORPORATION, *Appellant*, v. DON C. McCOWAN, *Appellee*.

No. 23,072.

MISSOURI FINANCE CORPORATION, *Appellant*, v. C. W. WESTON, *Appellee*.

No. 23,073.

MISSOURI FINANCE CORPORATION, *Appellant*, v. JULIUS KRUEGER, *Appellee*.

SYLLABUS BY THE COURT.

REPLEVIN—*Automobiles—Bailee Held out as Apparent Owner of Cars— Innocent Purchasers—Judgment on Opening Statement of Plaintiff's Counsel*  A man of small means procured an agency for the sale of automobiles from the distributor at Kansas City, Mo., and opened a garage and salesroom at Independence, Kan.  By an arrangement between the distributor, the plaintiff, and the dealer, the latter obtained possession of automobiles in this way: The distributor shipped automobiles to Independence, on bill of lading to its own order, notify dealer, and advised the plaintiff. The distributor sent the bill of lading, with draft for price attached, to a bank in Independence. The plaintiff mailed to the bank a draft to take up the distributor's draft and bill of lading, and to pay freight and other charges.  The plaintiff also instructed the bank to deliver the automobiles to the dealer, on his signing a storage receipt acknowledging title in the plaintiff and agreeing to deliver to no one except plaintiff or its order. The dealer reimbursed the plaintiff for freight and other charges, paid fifteen per cent of the distributor's price, and was given a written option to purchase.  The storage receipt and option to purchase were not recorded.  Without exercising his option to purchase, the dealer sold and delivered to innocent purchasers automobiles the possession of which he obtained by virtue of the scheme here outlined, and stated in detail in the opening statement of the plaintiff to the jury. *Held*, the plaintiff is not entitled to replevin the automobiles from the purchasers.

Appeals from Montgomery district court; JOSEPH W. HOLDREN, judge.  Opinion filed March 12, 1921.  Affirmed.

*John Bertenshaw*, of Independence, and *William B. Bostian*, of Kansas City, Mo., for the appellant.

*Walter L. McVey, Thurman Hill, W. N. Banks*, and *O. L. O'Brien*, all of Independence, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The actions were actions of replevin, to obtain possession of automobiles. Judgments were rendered for the defendants, and the plaintiff appeals.

The judgments were rendered on opening statements of the attorney for the plaintiff. The McCowan case was disposed of first. By agreement, the statement in that case was considered as made in the Weston case. A somewhat briefer statement was made in the Krueger case, but the essential facts were included. The statement in the McCowan case follows:

"If the court please, and gentlemen of the jury, a man named Denny came to this town some time in August of last year, without any capital, and proceeded to open up some sort of a garage and automobile concern selling automobiles, and I believe he got the agency for the 'Tulsa Four' and the Oldsmobile from the Hathaway Motor Company of Kansas City, Mo., who were general distributors of the Oldsmobile.

"Now gentlemen, the testimony will show he at once needed some financing plan to help him out, and he had asked for a certain concern in Kansas City to finance all of his deals, and he wrote to that effect to the Hathaway Motor Company. That concern had been dealing with the Missouri Finance Corporation, and, to make a long story short, Mr. Denny accepted the Missouri Finance Corporation's plan, and started out to do business with them.

"Now here was the way the business was done. Mr. Denny did not have the money to buy these cars. You gentlemen perhaps know that when a distributor gets a bunch of cars from the factory, a bill of lading with sight draft comes, and they have to take up that bill of lading—the sight draft—to get the bill of lading for the cars, because the distributor pays cash for the cars. The distributor in turn has dealers throughout the several states, of course, and those dealers must pay cash to the distributors.

"Now as I said, Mr. Denny could not pay cash to the distributor. So it was necessary for some concern to buy the cars, and I'll explain to you now the arrangement that was entered into in this case as well as in all cases. The first cars were sent sometime in November—in December, and under an arrangement with the Hathaway Motor Company in Kansas City, the Missouri Finance Corporation was given a duplicate invoice of the three cars, see, that were going to be in the freight car that was going to be shipped out here, with the total cost. They agreed with the Hathaway Motor Company in Kansas City to buy those cars. The Missouri Finance Corporation agreed to buy them.

"Now the cars were put on board the railroad cars, and a bill of lading from the Hathaway Motor Company to the Hathaway Motor Company at Independence, Kan., notify T. E. Denny. You gentlemen all know how

these bills of lading are worded, when it is not an out-and-out sale at all. These bills of lading, I say, were from the Hathaway Motor Company to Hathaway Motor Company at Independence, Kan., over the Santa Fe most of the time I think, notify T. E. Denny.

"Now the Missouri Finance Corporation knew that these cars were going to be sent out here consigned to the Hathaway Motor Company, and the Hathaway Motor Company were going to keep the title to those cars until it got the cash, because these were cash sales. The Missouri Finance Corporation was notified, you see, of the total expense to take up these three cars: Freight, war tax and insurance, and decking, I believe they call it. If there are three cars in a car, $25 for decking. They knew what that was going to be—the total amount of it.

"So—I might say this first, the Missouri Finance Corporation never saw Mr. Denny; never knew Mr. Denny, but from some recommendations from people to whom he had referred. One was a congressman in the state of Washington, and one was an official in the railroad administration in Washington, D. C., W. T. Tyler, director division of operation, who says his acquaintance was very slight with Mr. Denny. Has known of him in a business way, however, for a number of years, and would regard him as a satisfactory financial and moral risk. All of the letters were about the same way. I might say that one of our letters was a letter from Albert Johnson, Washington, D. C., who had appointed Mr. Denny's son to the naval academy at Annapolis, and who says, 'I have known Mr. Denny for several years past, and know him to be a man of the highest personal character and splendid integrity. For a number of years he resided in Centralia, Wash., where he held a responsible position with the Northern Pacific Railroad.'

"In other words, the Missouri Finance Corporation, gentlemen, from the above investigations, felt sure that this man, who was formerly a citizen of your community, and whose whereabouts now we don't know or are not aware of, the letters were to the effect that he was a man of integrity and business responsibility, and a good moral risk.

"Now never having seen him, when the first car of automobiles were sent by the Hathaway Motor Company to the Hathaway Motor Company at Independence, notify T. E. Denny, we sent a letter to the Commercial National Bank of this town, with which bank Mr. Denny was doing business, and notified them that we sent the bill of lading to them, and that we were enclosing our check for $4,242.33, to cover the Hathaway Motor Company draft for like amount, and asking them to send us the canceled draft of the Hathaway Motor Company, and to take certain signed statements or contracts with Denny, so when we took up the draft here we became the owner of the car.

"As all you gentlemen know, the Hathaway Motor Company of course were selling the cars. Wanted to sell the cars. Denny couldn't buy them for cash. So the Missouri Finance Corporation bought them, and they were going to do this with Mr. Denny, and give him an option to buy them. So you see that this draft that we sent took up the Hathaway Motor Company's draft which was drawn on Mr. Denny, but which

Finance Corporation v. McCowan.

Mr. Denny and the Hathaway people all knew we would take up, and which Mr. Denny's bankers knew we would take up. And we sent this draft, with instructions and certain papers to sign, to the Commercial National Bank, and we asked that the Commercial National Bank deliver first the cars to Mr. Denny on these conditions, that he sign certain storage receipts, which were, 'Date, December 15, 1919. The undersigned, T. E. Denny, has received from Missouri Finance Corporation one new automobile described as follows: Oldsmobile Roadster —.' That is the car I might say, that Mr. Denny unlawfully, as we say the evidence will show, sold to Dr. McCowan. Now here is the storage receipt that Mr. Denny signed, to the effect that he had received from the Missouri Finance Corporation, one automobile, described as follows: 'Oldsmobile Roadster, 1919 model, motor No. D34822; chassis No. or infrs. No. AR498, which is stored at the expense of the undersigned for said Missouri Finance Corporation at 111 W. Laurel, Independence, Kan.; and the undersigned'—that is Mr. Denny, who signed this—'and the undersigned acknowledges that said automobile is the property of the Missouri Finance Corporation, and agrees that the undersigned will deliver same only to Missouri Finance Corporation or its order, and only upon surrender of this receipt, duly endorsed by Missouri Finance Corporation. Signed T. E. Denny.'

"And over here is an endorsement which was to be filled out when Mr. Denny bought the car from us. 'The within storage receipt, with our rights hereunder, is hereby assigned to ———— without recourse to us in any manner. Dated ———— Missouri Finance Corporation, by ————.'

"So you see that when Mr. Denny had enough money on hand from his business to buy this roadster, which this whole case this morning is about, a roadster automobile—when he had enough money on hand to buy this car, he was to buy it and pay for it, and then we would send him this storage receipt, duly endorsed, which gave him title to the car.

"Now in addition to that storage receipt, we gave him an option to purchase the car at the same time, and that was dated December 15, 1919. And I might say that before the car was delivered to him—now I want you gentlemen to get this straight, and I don't want to be too long, either, but I think a few explanations will help the whole situation. Now when our draft took up the Hathaway Motor Company's draft, we paid, of course, the freight, war tax and insurance, and cost of decking, and everything on that car. And there were three of them. And the whole amount was $4,242.43. Now at the same time that Mr. Denny signed this storage receipt, after he got the car he also signed an option to purchase, and he paid the freight, war tax and decking, and fifteen per cent of the wholesale price to us. And in this instance, on these three cars, he paid us about a thousand dollars. Now this option to purchase says, 'In consideration of the sum of one dollar and other valuable consideration, receipt whereof is hereby acknowledged, we, Missouri Finance Corporation, 216-218 City Bank Building, Kansas City, Mo.,

40—108 Kan.

hereby grant to you, T. E. Denny, 111 W. Laurel, Independence, Kan., an option to purchase the following described automobile, which you now have in storage for us as bailee'—that is, if you have something that belongs to some one else, and are storing it or keeping it, you are what the law calls a bailee—'under a storage receipt signed by you, bearing date the 15th day of December, 1919.' Then it goes ahead and describes this roadster again, 'on or before twelve o'clock noon on the 14th day of January, 1920, at which time this option, unless theretofore exercised by you, and all your rights hereunder, shall terminate, without any notice from or action by the Missouri Finance Corporation. Said automobile is not to be used by you, or to be removed from the premises where stored, for any purpose, at any time prior to your exercise of this option and the payment in full of the option price in cash or by certified check; and in no event is said automobile to be used or removed from said premises without surrender to you of the storage receipt covering the same, duly endorsed by us. Total loss or destruction of said automobile will relieve us from all obligation to deliver the same or any similar automobile; but in the event of total destruction, we will repay to you any sum paid as consideration for this option.'

"The option price here was $972.31. If he paid that price to us and got this storage receipt and we endorsed it over, then he became the owner of the car. Until he did that he wasn't to use it or remove it from his storehouse there, or do anything. Now provided that in case the automobile was a total loss, say by fire, that was our loss. If it burned up it was our loss, and we were relieved from any obligation to deliver the same kind of an automobile to him. But in the event of total destruction, we will repay to you any sum paid as consideration for this option. If the car was burned up, we wouldn't have to give Mr. Denny the same sort of a car, but we returned everything he paid to us. So that clearly shows of course that the car belonged to us. If it burned up we got the loss. We paid Mr. Denny back what money he paid as an option to buy the car.

"Now a financial statement on Mr. Denny, in addition to those letters we received, either through Dun or Bradstreet, or some of those people, you know, and Denny has been a resident and in business at Independence only for the past six months, and he is not intimately known by authorities. He has an investment in the business of from $2,000 to $2,500 it is said, and has been selling the Tulsa Four automobiles and seems to be doing very well. He is apparently a good straight young fellow with good habits. He is now making good on his own account and retaining a good business reputation. He has a record for prompt pay, no history of suits or judgments, and no claims have appeared for collection. In the absence of a statement it is difficult to make an estimate of his net responsibility. It is believed that from $2,000 to $2,500 is a conservative figure.

"Well now, gentlemen, that is the way this deal came about. Now as the time for the exercise of this option—thirty-day option you know—came along, why Mr. Pugsley, who was the manager of this corporation in Kan-

Finance Corporation v. McCowan.

sas City, received letters from Mr. Denny to the effect that the weather had been bad, you know, and it had been a late spring, and he hadn't had any sales, and he expected the roads to dry up and people to come to town, and he expected some sales, and so he sent the small charge for extending this option. I can see from the expression of the faces of all of you gentlemen that you know what happened. He paid us the small amount, the regular charge for extending the option to buy the cars. And I might say that there were about three carloads of cars shipped to him. Nine cars. And every time the thirty days was up—that is about two times, in December, January and February—we didn't let this go for a year or so. But we let him extend that option upon payment of the regular small consideration, which would be deducted from the option price, on the strength of his letters that the roads were bad, and he hadn't had any sales, and so forth, and of course while we didn't have to extend them at all—whereas the option said that at the end of thirty days, unless theretofore exercised by you—unless he had before that time taken up the option by paying the option price—all your rights hereunder shall terminate, without any notice or action from Missouri Finance Corporation.

"But we wanted to give the man a chance to sell the cars, so we extended the option, as I said.

"Well now, gentlemen, in February—we just started this December 19—in February he had nine automobiles that belonged to us, that he had paid some money for the option to buy them, as I have explained to you. And he wanted three more. And the Hathaway Motor people sent three more up here, consigned to the Hathaway Motor Company, and Mr. Pugsley told them this man had nine cars. That was a pretty big business when a man was supposed to have but two thousand dollars. So we didn't take those up. And the Hathaway Motor Company then had to send them to Coffeyville, which they did. But we sent a man down here right away to see why Mr. Denny wanted three more cars if he had nine cars on his floor; and came down here, and of course you gentlemen know what we found. We found—

"I might say during this time he had paid for one car. That was a coupe—Oldsmobile coupe, which he sold to some doctor not very far from here.

"Now I think the evidence will show that when he sold, or tried to sell, to Dr. McCowan, one of these cars, he took a secondhand car of the doctor's, and took a thousand dollar check from the doctor. The check was good, of course. It was payable to Mr. Denny. And I am not sure, but I think the evidence will show—and that is all I'm telling you, that the evidence will show all of these facts. And I think the evidence will show that the thousand dollars that my good friend Dr. McCowan—he was in the army at the same time I was, and we are no enemies on account of this deal—I think the evidence will show that the thousand dollar check Dr. McCowan gave, Mr. Denny banked, and took up the option on a car he had sold to another doctor about two weeks before he tried to sell this car to Dr. McCowan.

"But I want to finish now. It won't be disputed that Mr. Denny had only sold one car. This is, he had only bought one car from us, and that was the only one he had a right to sell. We wondered why he wanted three more if he had eight on his floor, so Mr. Pugsley and I sent a man down here. What did he find? Why, he found these five cars Mr. Denny had tried to sell to people around here, and had gotten secondhand cars in trade and a very small amount down, or had gotten all cash, as in one or two instances, and the cars were gone. Well now then they were our cars, with our money bought, Mr. Denny not having any title to them. Stood on the floor just like the Tulsa Fours.

"So they sent for me to come down here, and I came down here. I saw the Tulsa Fours on his floor. I said, 'Do you own these?' He said, 'No.' Now in order to avoid any question about the matter, not knowing what rights he had under this option contract, and in order to make sure that he had no right to sell these cars until he first bought them, why we had this put on the option to purchase: 'The undersigned hereby certifies that as to the car or motor truck above described, which the undersigned now has in storage, as bailee, the undersigned has no contract or agreement with the Missouri Finance Corporation, or otherwise, other than that embraced within the option to purchase, of which the foregoing is a true copy, and the storage receipt therein referred to. Date, December 15, 1919. T. E. Denny.' That is, that was put on so that he would acknowledge that the only agreement of any kind he had with us was in writing, and was composed of the storage receipt and the option to purchase. We have the signature there and we have it there.

"Now of course you gentlemen around here didn't know under what agreement or what terms these cars were stored there. But here was the man who came here without capital. Got a small garage, and who had nine Oldsmobile cars on his floors—brand new ones that were to be stored there, and seven Tulsa Fours. And I want to ask you gentlemen of the jury, if you had gone in that place and saw nothing there but new cars, and saw a man who would clearly show to you to be not of much financial responsibility, I want to ask you if it would occur to you at all whether or not the man owned those fifteen cars that were on the floor there? And if you were going to buy one, or try to buy one, whether or not you would have made an investigation?"

It was admitted by counsel for plaintiff that the options to purchase and the storage receipts were not filed for record.

The court is not disposed to hold counsel to express admissions characterizing the scheme under which Denny held possession of the automobiles, such as, "We wanted to give the man a chance to sell the cars." The scheme speaks for itself. It was devised to enable a dealer without sufficient capital of his own to pay cash for his merchandise, to sell automobiles, at retail, to the purchasing public, from a stock kept on display in his store.

Finance Corporation v. McCowan.

There is nothing peculiar about the commodity or the chain of economic events. The motor vehicle is an article of necessity the same as the farm wagon. At one end of the chain of events is the producer, the manufacturer; at the other, the consumer, McCowan and other residents of Independence and vicinity. Between producer and consumer are the wholesale dealer and the retail dealer. In this instance the retail dealer needed financial backing. The plaintiff came into the sequence just as the Independence bankers might have done by taking up bills of lading and securing themselves by title instruments. Frills added to the transaction, like a storage contract and an option to purchase, did not change its essential nature. The plaintiff was not dealing in automobiles, and did not need the services of a warehouseman. It was financing a tradesman, and the instruments employed were instruments of security. The plaintiff staked the local dealer for the distinct purpose of enabling him to sell automobiles. To that end the plaintiff invested him with possession, apparent ownership, and apparent right to sell. Nominally, he was to account in thirty days for each consignment; but if weather were bad and trade were dull, he was given further time to find purchasers. The question here is not one involving lack of knowledge that a bailee or other possessor was making unauthorized use of property in his possession. The end and aim of the bailment was that the bailee might sell, and no paper contrivance to throw risk of the bailee's fidelity upon the buying public may be tolerated. The public policy of the state demands publicity as a protection against fraud. Secret arrangements which place it in the power of a dealer to deceive unsuspecting purchasers are condemned. Registry offices are provided through which persons in the situation of the plaintiff may give public notice of their claims. Not having availed itself of the protection thus afforded, the plaintiff is estopped by the admitted facts from questioning the titles of the defendants.

The authorities cited by the plaintiff have been examined. It is not necessary to review them. The principle involved is very well expressed in 16 Cyc., at page 773:

"Where the true owner of property holds out another, or allows him to appear as the owner of or as having full power of disposition over the property, and innocent third parties are thus led into dealing with such apparent owner, or person having such apparent power of disposition,

they will be protected. Their rights in such cases do not depend upon the actual title or authority of the party with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing as against them the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in the party making the conveyance."

In the case of *Downes v. Rogers*, 102 Kan. 797, 171 Pac. 1150, a sales agent gave a storage receipt for tractors, title to which he could obtain by paying a bank in the city in which he did business. The court said:

"Whatever may have been the private or confidential business relations between the plaintiffs and the sales agent, the defendant showed by competent evidence, amply sufficient to sustain the verdict and judgment, that the plaintiffs had established the sales agent in Hutchinson to sell tractors, and that they had held him out to defendant and to the general public in that community as their agent. Defendant was not apprised of any restriction placed by plaintiffs on the agent's authority. It would utterly destroy the foundations of all business confidence between dealers and customers to countenance a claim like the one set up in this case. . . .

"By rights this case should be disposed of in a *per curiam* opinion, for no shadow of error appears in the record, nor is anything presented which is worthy of comment." (p. 798.)

The decision would have been the same if the Downes company had done no more than establish Rogers in Hutchinson to sell tractors.

Purchasers may be put on guard by notice other than that afforded by registry of instruments. That subject was dealt with in the opening statements, and it was conceded that members of the community in which the dealer operated were ignorant of the terms on which he obtained his goods. The fact that the dealer had nine new cars of one kind and several of another kind in his establishment was no warning to the public that he was a man of small means, or that he had no right to make sales of his wares.

The rule with reference to rendering judgment on an opening statement is well understood. It was applied in the case of *Smith v. Insurance Co.*, ante, p. 572. In this instance counsel took great pains to state, and even to argue, the facts on which he sought to base recovery. The facts were insufficient for the purpose, and nothing would have been gained by proceeding with the trials.

The judgments of the district court are affirmed.